UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

WESLEY EUGENE BROOKS,                          CIVIL NO. 14-3005 (SRN/JSM)

      Petitioner,

v.                                                             REPORT AND RECOMMENDATION

BRUCE REISER, Warden
Minnesota Corrections
Facility, Faribault,

      Respondent.

JANIE S. MAYERON, United States Magistrate Judge

The above matter is before the undersigned United States Magistrate Judge upon Petitioner Wesley Eugene Brooks' Petition for Writ of Habeas Corpus (Scott County) [Docket No. 1] and Respondent Bruce Reiser's Motion to Dismiss Petition for Writ of Habeas Corpus [Docket No. 7].  The matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

## I.   FACTUAL BACKGROUND[1]

On July 31, 2009, at 2:06 a.m., Petitioner Wesley Eugene Brooks ("Petitioner") was speeding away from a bar in his SUV when he was stopped by a Shakopee police officer.  State v. Brooks, 838 N.W.2d 563, 566 (Minn. 2013) ("Brooks III").  Petitioner smelled of alcohol, and the officer ordered Petitioner out of the vehicle.  Id.  Petitioner's

---

[1]   Petitioner commenced two habeas corpus cases on the same day against Respondent – the instant case arising out of convictions in Scott County, and Brooks v. Reiser, Civ. No. 14-3007 (SRN/JSM), arising out of a conviction in Hennepin County. Both cases raise identical issues and involve one decision by the Minnesota Supreme Court.  Consequently, as the two habeas petitions are inextricably intertwined, the Court provides the underlying facts that bear on both cases.

attorney, who was a passenger in the SUV, advised Petitioner not to perform any field sobriety tests, and so the officer took Petitioner to the hospital.  <u>Id.</u>

At the hospital, the officer read Petitioner the operative Minnesota implied consent advisory, which informed drivers that Minnesota law requires a person: (1) to take a test to determine if the person is under the influence of alcohol; (2) refusal to take a test is a crime; and (3) the person has the right to consult with an attorney, but only to the extent that it does not unreasonably delay administration of the test.  Minn. Stat. § 169A.51, subd. 2 (2007).

Petitioner spoke to his attorney and agreed to provide a urine sample.  <u>Brooks III</u>, 838 N.W.2d at 565.  The sample showed that Petitioner's blood alcohol concentration was .14, which was above the legal limit of .08.  <u>Id.</u>

On January 16, 2010, at 7:03 p.m., Petitioner was driving his pickup truck through Hennepin County when he passed a Minnesota state trooper on Interstate 35. <u>Id.</u>  The trooper saw sparks flying underneath the truck and initiated a traffic stop.  <u>Id.</u> Petitioner appeared intoxicated, and he was taken to the hospital where the trooper read him the implied consent advisory.  <u>Id.</u>  After speaking with counsel, Petitioner first agreed to take a urine test, but could not urinate.  <u>Id.</u>  He spoke to his attorney again, and then agreed to take a blood test, which showed a blood alcohol concentration of .16. <u>Id.</u>

On January 25, 2010, at 7:11 a.m., a Prior Lake police officer responded to reports of a vehicle stopped in the road between two middle schools.  <u>Id.</u>  The officer found Petitioner unconscious in the driver's seat.  <u>Id.</u>  Petitioner smelled of alcohol, and officers had to help him walk to the squad car.  <u>Id.</u> at 566.  Petitioner was taken to the

2

Scott County Jail, where officers read him the implied consent advisory.  Id.  Petitioner spoke with his attorney and agreed to give a urine sample, which showed an alcohol concentration of .16.  Id.

Police never attempted to secure a search warrant in connection with any of these incidents.  Id. at 565, 566.

For each separate driving incident, Petitioner was charged with two counts of first-degree driving while impaired pursuant to Minn. Stat. §§ 169A.20 and 169A.24.  Id. at 566.  In each case, Petitioner moved to suppress the results of the blood and urine tests on the grounds that the police obtained the samples without a warrant.  Id.

The two Scott County cases were consolidated.  Id.  On November 29, 2010, the Scott County District Court denied Petitioner's motion to suppress.  Resp.'s Ex. 24 (November 29, 2010 Order in Scott County District Court Cases attached as Appx. A-3-A-6 to Appellant's Brief to Minnesota Supreme Court dated July 22, 2013).  After concluding that reliance on implied consent law was insufficient to justify a warrantless taking of blood or urine and that the implied consent procedure may be "unnecessarily coercive," the Scott County court found that exigent circumstances justified the warrantless search.  Id.

In the Hennepin County case, the district court found that Petitioner had consented to the test at the hospital and denied Petitioner's motion to suppress evidence.  Brooks III, 838 N.W.2d at 566; Resp.'s Ex. 24 (Findings and Order dated September 9, 2010, attached as Appx. A-7-A-10 to Appellant's Brief to Minnesota Supreme Court dated July 22, 2013).

Petitioner was convicted in the Scott County and Hennepin County cases of first-degree driving while impaired, in violation of Minn. Stat. §§ 169A.20, subd. 1(5) and 169A.24.  Brooks III, 838 N.W.2d at 566.  Petitioner was sentenced to a 48-month term of imprisonment in Hennepin County, as well as two concurrent 72-month terms in Scott County.  Id. at 566-67.

Petitioner appealed the Hennepin County and Scott County convictions to the Minnesota Court of Appeals.   In May, 2012, the convictions were affirmed on the grounds that the exigent-circumstances exception to the warrant requirement applied to the search and seizure of Petitioner's blood and urine.  State v. Brooks, No. A11-1042, 2012 WL 1570064, at *2 (Minn. Ct. App. May 7, 2012) ("Brooks I"); State v. Brooks, No. A11-1043, 2012 WL 1914073, at *2 (Minn. Ct. App. May 29, 2012) ("Brooks II").  In the latter decision arising out of the Hennepin County case, Petitioner challenged the district court's denial of his motion to suppress his blood-test results, on grounds that "his consent was coerced and therefore invalid, because the implied-consent advisory informed him that refusal to take a test is a crime."  2012 WL 1914073, at *2.  Based on the Minnesota Supreme Court decision, State v. Netland, 762 N.W.2d 202 (Minn. 2009), the appellate court declined to address whether the implied-consent advisory coerced Petitioner's consent and was subject to the unconstitutional-conditions doctrine;[2]

---

[2]      The Court of Appeals described the unconstitutional-conditions doctrine as follows:

> In Netland, the appellant argued that the state "impermissibly condition[ed] her driving privileges on an unconstitutional, warrantless search for blood-alcohol content" and that "the criminal sanctions imposed by the test-refusal statute nullify the voluntariness of submission to a chemical test." The supreme court noted that the unconstitutional-conditions

instead, the court upheld the constitutionality of the search and seizure on the ground of exigent circumstances.  Id.

On June 5, 2012, Petitioner filed petitions for further review of the Hennepin County and Scott County convictions in the Minnesota Supreme Court.  Brooks III, 838 N.W.2d at 567.  Petitioner also filed a motion to consolidate his petitions because the Minnesota Court of Appeals had affirmed the convictions on the same legal grounds.  See Resp.'s Ex. 11 (Motion to Consolidate Petitioner for Review in Appellate Files A11-1042 (Scott County case) and A11-1043 (Hennepin County case)).  In support of his motion to consolidate, Petitioner described the issue presented in the appellate decision of the Hennepin County case as:

> whether the consent under the Implied Consent law is voluntary.  The Court ruled that, because a single factor exigency exists in all driving while impaired cases so as to excuse the requirement of a search warrant under the Fourth amendment of the United State Constitution and its Minnesota counterpart, consent need not be addressed under the Unconditional Conditions Doctrine.

Id., ¶ 2.  On July 17, 2012, the Minnesota Supreme Court granted Petitioner's motion to consolidate, but it denied further review.  Resp.'s Ex. 12 (July 17, 2012 Order in Minnesota Supreme Court Case Nos. A11-1042 and A11-1043).

Petitioner then filed a petition for writ of certiorari in the United States Supreme Court.  Resp.'s Ex. 13 (Petition for a Writ of Certiorari).  In his Statement of Facts, Petitioner stated:

---

> doctrine "reflects a limit on the state's ability to coerce waiver of a constitutional right where the state may not impose on that right directly" and that courts have applied the doctrine in other cases not involving search-and-seizure rights.

Brooks II, 2012 WL 1914073, at *2 (quoting Netland, 762 N.W.2d at 211-12 & n. 8).

- He had filed pretrial motions in both the Scott County and Hennepin County cases to suppress the results of the blood and urine tests on grounds that the samples were seized without a warrant and in the absence of any valid exceptions to the warrant requirements of the Fourth Amendment.  The trial court in Hennepin County had ruled that he had voluntarily consented to the blood test despite the fact he was told by the officer that if he refused to give his consent, he would be charged with a separate crime.  <u>Id.</u>, p. 4.

- Following his Hennepin County conviction, he appealed the decision to the Minnesota Court of Appeals, arguing his consent was not voluntary.  <u>Id.</u>

- In the Hennepin County case, the hearing held on August 6, 2010, elicited the following:

  > On January 16, 2010, Petitioner was stopped at 7:03 p.m. and almost immediately arrested for DWI.  The arresting officer testified that for approximately the next hour and a half, she and a backup officer conducted an "inventory" search of the vehicle on the side of the road while Petitioner sat handcuffed in the backseat of her squad car.  After the "inventory" search was unsuccessful in finding any contraband, the arresting officer read Petitioner the Minnesota Implied Consent Advisory which states, among other things, that "[a]t the time a test is requested, the person must be informed: (1) that Minnesota law requires the person to take a test … [and] (2) that refusal to take a test is a crime."  Minn. Stat. § 169.51, subd. 2(1)-(2) (2008).  Petitioner, after consulting with a lawyer, consented to a blood draw, which was completed at 9:01 p.m., one hour and fifty-eight minutes after the stop.

  <u>Id.</u>, p. 6.

- In the Scott County urine tests cases, the record shows that between the time Petitioner was arrested and gave a urine sample, he contacted and spoke with an attorney.  <u>Id.</u>, p. 7.

On April 22, 2013, the Supreme Court granted the petition, vacated the judgments of the Minnesota Court of Appeals, and remanded the cases back to the

Minnesota Court of Appeals for further consideration in light of its recent decision, Missouri v. McNeely, 133 S. Ct. 1552 (2013).[3]  Brooks v. Minnesota, 133 S. Ct. 1996 (2013).

On May 8, 2013, the Minnesota Court of Appeals reinstated Petitioner's consolidated appeals.  Resp.'s Ex. 17 (May 8, 2013 Order of Minnesota Court of Appeals for Case Nos. A11-1042 and A11-1043).  Hennepin and Scott County filed Petitions for Accelerated Review in the Minnesota Supreme Court.  Resp.'s Ex. 21 (Respondent Scott County's Petition for Accelerated Review and Appendix), Resp.'s Ex. 22 (Respondent Hennepin County's Petition for Accelerated Review and Appendix).  On July 16, 2013, the Minnesota Supreme Court granted the petitions for accelerated review.  Resp.'s Ex. 23 (July 16, 2013 Order of Minnesota Supreme Court for Case Nos. A11-1042 and A11-1043).

In his brief to the Minnesota Supreme Court, Petitioner stated that the Scott County and Hennepin County cases were tried to the courts based on stipulated facts. Resp.'s Ex. 24 (Appellant's Brief to Minnesota Supreme Court dated July 22, 2013), pp. 1, 5.

With respect to the Hennepin County case, in the Statement of Facts of his brief, Petitioner indicated that following his arrest and while travelling to Hennepin County Medical Center, the arresting officer, Williams

---

[3]   In McNeely, the State argued that "whenever an officer has probable cause to believe an individual has been driving under the influence of alcohol, exigent circumstances will necessarily exist because BAC evidence is inherently evanescent." 133 S. Ct. at 1560.  The Court rejected that argument, holding that police must determine whether an exigency exists on a case-by-case basis.  Id. at 1561.  Thus, "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."  Id. (citation omitted).

> read the Minnesota implied consent advisory to Brooks. The advisory informed Brooks that Minnesota law required him to take a test, that refusal to take a test is a crime and if the test was unreasonably delayed he would be considered to have refused.
>
> Brooks said he wanted to talk to a lawyer first, so Williams took Brooks inside the hospital and Brooks called a lawyer. Brooks finished his telephone call at 8:36 p.m. and said he would submit to a urine test.
>
> Brooks tried for several minutes but could not produce a urine sample. Williams asked Brooks if he would submit to a blood test and, after he talked to his lawyer again, at 9:01 p.m., two hours after he was stopped on the highway, Brooks submitted to a blood test.

Id., pp. 7-8 (internal citations omitted).

With respect to the Scott County cases, Petitioner specified in his brief that the parties had stipulated to the time of the stops and the collection of the urine, and to the admission of the implied consent advisories that were admitted as exhibits. Id., p. 9. As to Shakopee case, Petitioner stated:

> At the hospital, [the arresting officer] read the implied consent advisory to Brooks. The advisory informed Brooks that Minnesota law required him to take a test, that refusal to take a test is a crime and if the test was unreasonably delayed he would be considered to have refused the test. After talking to his lawyer by telephone, at 3:15 a.m. Brooks submitted a urine sample.

Id., p. 10 (internal citations omitted).

For the Prior Lake case, Petitioner said that after his arrest

> [t]he officers read the implied consent advisory to Brooks. The advisory informed Brooks that Minnesota law required him to take a test, refusal to submit to testing is a crime and he would be considered to have refused the test if he unreasonably delayed. Brooks talked to a lawyer by telephone and said he would take a urine test. At 8:32 a.m. he submitted a urine sample . . . .

Id., pp. 10-11 (internal citations omitted).

Petitioner then argued that the results of his blood and urine samples should have been suppressed at trial because there were no exigent circumstances to justify the warrantless blood and urine searches, and Petitioner did not validly consent to the searches.  Id., pp. 18-27.  Based on the United States Supreme Court case, Bumper v. North Carolina, 391 U.S. 543 (1968), Petitioner maintained that the state could not prove consent merely by showing that a person acquiesced to a claim of lawful authority.  Id., pp. 23-24 (citing 391 U.S. at 548, 549 n. 14, 550).

In response, Scott County asserted that exigent circumstances excused the warrant requirement, and that in any event, Petitioner had consented to the tests by not only choosing to drive, but by agreeing to the tests pursuant to an implied consent advisory that did not unconstitutionally coerce his consent.  Resp.'s Ex. 25 (Respondent Scott County's Brief and Appendix), pp. 12-21.  Hennepin County responded that after speaking to lawyer, Petitioner voluntarily consented to both the urine test and blood test. Resp.'s Ex. 26 (Respondent Hennepin County's Brief and Appendix), pp. 4-5, 12-13.  In addition, the Minnesota Attorney General's Office submitted an amicus brief and contended that McNeely acknowledged that a chemical test taken under the state's implied consent law was constitutional, alcohol tests conducted pursuant to Minnesota's consent law were constitutional, and Petitioner had consented to the chemical testing. Resp.'s Ex. 27 (Brief of Amicus Curiae State of Minnesota, by Its Attorney General Lori Swanson), pp. 3-12.

In his reply brief to the Minnesota Supreme Court, Petitioner again claimed that he had not consented to any alcohol testing when he said "yes" to tests administered to

him pursuant to an implied consent process that threatened him with criminal sanctions for refusing.  Resp.'s Ex. 28 (Appellant's Reply Brief and Appendix), pp. 12-13.

On October 23, 2013, the Minnesota Supreme Court affirmed Petitioner's convictions.  The court held that Petitioner had consented to the searches and that Minnesota's implied consent law was constitutional.  Brooks III, 838 N.W.2d at 568-73. In reaching this conclusion, the court set out the factual basis for the Hennepin County District Court's determination that Petitioner had consented to both a urine and blood test.  Id. at 567-68 ("The Hennepin County District Court found that Brooks consented to both a urine test and a blood test in the Minneapolis case, noting that nothing in the record suggested 'in any way' that police misled Brooks 'with respect to his obligation to undergo blood alcohol content testing or the penalties he might face should he fail to satisfy those obligations.' The court found nothing in the record to suggest that Brooks 'was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired.' The court also found nothing suggesting that Brooks, 'after twice talking with his attorney,' was consenting to the tests 'because he was being forced to do so or that his consent to the blood test was not a knowing and voluntary consent on the part of the Defendant.'").

As for the Scott County cases, the court acknowledged that Scott County had not argued, nor did the Scott County District Court determine, if Petitioner had consented to the urine tests.  Id., at 568 n. 2.  Nonetheless, the court found that the record was sufficiently developed for it to consider the issue of consent in the Scott County cases because the facts upon which it was relying for its conclusion that Petitioner had consented were facts to which the parties stipulated.  Id.

Relevant to the issues raised by the instant habeas petition, the court stated:

> The parties do not dispute that the police complied with all statutory requirements in each of the three incidents at issue here. The parties also do not dispute that Brooks consented as a factual matter to the three searches. Our analysis likewise confirms that Brooks consented. As noted above, whether Brooks consented is assessed by examining all of the relevant circumstances. This analysis requires that we consider the totality of the circumstances, "including the nature of the encounter, the kind of person the defendant is, and what was said and how it was said." State v. Dezso, 512 N.W.2d 877, 880 (Minn.1994).
>
> Here, the nature of the encounter includes how the police came to suspect Brooks was driving under the influence, their request that he take the chemical tests, which included whether they read him the implied consent advisory, and whether he had the right to consult with an attorney. Brooks does not argue that police did not have probable cause to believe that he had been driving under the influence. He also does not contend that police did not follow the proper procedures established under the implied consent law. Police read Brooks the implied consent advisory before asking him whether he would take all three tests, which makes clear that drivers have a choice of whether to submit to testing. In all three cases, police gave Brooks access to telephones to contact his attorney and he spoke to a lawyer. In fact, in one case, he even had two separate phone calls with an attorney. After consulting with his attorney, Brooks agreed to take the tests in all three instances.
>
> Brooks nevertheless argues that his "consent" was coerced and therefore invalid. Specifically, Brooks argues that he did not truly have a choice of whether to submit to the tests because police told him that if he did not do so, he would be committing a crime, and he contends that the fact that police advised him that it is a crime to refuse the chemical tests renders any consent illegally coerced. We disagree.

Id. at 569-70 (footnote omitted).

After distinguishing Bumper and discussing the impact of Petitioner's arrest, Petitioner's consultation with lawyers, and the choice Petitioner was given either to

submit or decline testing, the court concluded that under the totality of the circumstances, Petitioner had voluntarily consented to the searches at issue. Id. at 571-72.

Petitioner filed another petition for writ of certiorari in the United States Supreme Court. Resp.'s Ex. 30. That petition presented this question for review: "[W]hether a person can be deemed to have 'consented' to a warrantless search of his person when, before the test request is made, he is told by a police officer that state law requires submission to the test and that withholding 'consent' to the test is a crime." Id., p. i. In his statement of facts in support of the petition, Petitioner averred the following:

- As to the Hennepin County case, State Trooper Williams read Petitioner the Minnesota implied consent advisory while travelling to the Hennepin County Medical Center. The advisory informed Petitioner that he had to take an alcohol test, and that refusal to take a test is a crime. Petitioner arrived at the hospital at 8:22 p.m. Petitioner spoke to his lawyer and then agreed to take a urine test at 8:36 p.m. However, Petitioner was unable to urinate. Williams asked Petitioner if he would take a blood test. After speaking with his lawyer again, at 9:01 p.m., Petitioner submitted to a blood test. Id., pp. 7-8.

- In the Shakopee case, Officer Schmidt read Petitioner the Minnesota implied consent advisory at the hospital, which informed Petitioner that he must take a test, and refusal to take a test is a crime. Petitioner conferred with his attorney by telephone and agreed to submit a urine sample. The test revealed an alcohol concentration above the legal limit. Id., p. 9.

- In the Prior Lake case, an officer read Petitioner the implied consent advisory, informing Petitioner that he was required to take an alcohol test, and refusal to do so is a crime. Petitioner spoke to his lawyer by telephone and agreed to take a urine test. Petitioner's urine same yielded an alcohol concentration above the legal limit. Id., p. 10.

- In each these cases, Petitioner moved to suppress the results of his blood or urine tests on the ground that it was conducted without a warrant or an exception to the warrant requirement. Id., p. 4.

- The Hennepin County District Court ruled that Petitioner had consented to the tests.  Petitioner stipulated to the state's version of the facts to preserve his right to appeal the Hennepin County District Court's denial of his suppression motion.  As a result, he was convicted of Driving with an Alcohol Concentration of 0.08 or more.  Id.

- Petitioner appealed his Hennepin County conviction to the Minnesota Court of Appeals.  There, he argued that his consent was coerced because it was given under threat of being charged with a crime if he refused to take an alcohol test. Id.

- In the Scott County cases, the district court denied Petitioner's suppression motion on the ground that a single-factor exigency existed.  Petitioner again stipulated to the state's case to preserve his right to appeal and was convicted in both cases of Driving with an Alcohol Concentration of 0.08 or more.  Id., p. 5.

- Petitioner appealed his Scott County convictions, and the Minnesota Court of Appeals affirmed, ruling that that the evanescent nature of alcohol in urine created the same type of exigency as with a blood test.  Id.

Relying on these facts, Petitioner contended that, based on the Supreme Court's decisions in Bumper and Florida v. Royer, 460 U.S. 491 (1983), the Minnesota Supreme Court had incorrectly concluded that he had voluntarily consented to the urine and blood tests.  Id., pp. 11-26.  The United States Supreme Court denied the petition on April 7, 2014.  Brooks v. Minnesota, 134 S. Ct. 1799 (2014).

On July 25, 2014, Petitioner filed the present habeas petition, challenging his conviction in Scott County.  Petitioner argued that the Minnesota Supreme Court failed to follow and unreasonably applied the law of Bumper.  Petition for Writ of Habeas

Corpus ("Petition"), pp. 11-19 [Docket No. 1].   Petitioner also contended that the Minnesota Supreme Court's decision was based on an unreasonable determination of the facts when it concluded that he had voluntarily consented to the warrantless searches of his blood and urine pursuant to the coercive implied consent process.  Id., pp. 19-26.  In other words, the basis for Petitioner's request for habeas relief was that the Minnesota Supreme Court erred in its analysis and application of the law to the facts of his case.  Petitioner never alleged that he had not been afforded the opportunity to litigate his consent claim in state court.

Respondent Bruce Reiser ("Respondent") filed a motion to dismiss the Petition on August 18, 2014.  [Docket No. 7].  Respondent maintained that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Respondent's Memorandum of Law in Support of Motion to Dismiss Petition for Writ of Habeas Corpus, p. 2 [Docket No. 8] (quoting Stone v. Powell, 428 U.S. 465 (1976) (footnotes omitted)).  Consequently, because Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in state court, his claim was barred.  Id., pp. 2-3. Further, the two exceptions to Stone—"the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system"—did not apply.  Id., p. 3 (quoting Willett v. Lockhart, 37 F.3d 1265, 1273 (8th Cir. 1994) (en banc)).

In response to the motion to dismiss, Petitioner argued for the first time that he was not afforded a full and fair opportunity to litigate his Fourth Amendment claim. Petitioner's Response to Motion to Dismiss ("Pet.'s Resp.") [Docket No. 14]. Specifically, Petitioner asserted that the State's failure to provide him any corrective procedures to redress his Fourth Amendment consent claim and the unconscionable breakdown in the State's corrective procedures precluded him from litigating his claim. Id., pp. 2-6.  In support, Petitioner maintained he never litigated his Fourth Amendment consent claim in the Scott County District Court and the Minnesota Court of Appeals never considered the consent exception.  Id., pp. 3-4.  Consequently, "no corrective procedures [were] available to him after the Minnesota Supreme Court addressed consent for the first and last time without remanding the case to the district court for further inquiry on the issue.  Petitioner never had the opportunity to present evidence regarding consent, . . ." Id., p. 4.

Then, defining an unconscionable breakdown in the corrective process as the failure by the state court to conduct a reasoned inquiry into the facts and law of a petitioner's claim, (id., p. 5 (citing Valtin v. Hollins, 248 F. Supp. 2d 311, 317 (S.D.N.Y. 2003)), Petitioner contended that such a breakdown took place in his case because prior to the remand to the Minnesota Court of Appeals by the United States Supreme Court, he had relied on well-settled state law regarding the exigency exception to the warrant requirement, and he had no reasonable belief that consent was an issue.  Id., pp. 5-11 (citing United States ex rel. Bostick v. Peters, 3 F.3d 1023, 1027 (7th Cir. 1993); Bailey v. Duckworth, 699 F.2d 424, 425 (7th Cir. 1983); Boyd v. Mintz, 631 F.2d 247, 250–51 (3d Cir. 1980); Netland, 762 N.W.2d at 214; State v. Shriner, 751 N.W.2d

15

538, 549 (Minn. 2008); <u>Prideaux v. State</u>, 247 N.W.2d 385, 388 (Minn. 1976)).  As a result, at the trial court and appellate level, he and the courts only addressed the application of the exigency exception, and there was no reasoned inquiry into or consideration of his consent claim. <u>Id.</u>, pp. 6-11.

In reply, Respondent asserted that Petitioner had actually litigated the consent in issue in the Minnesota Court of Appeals, the Minnesota Supreme Court, and the United States Supreme Court.  Respondent's Reply Brief ("Resp.'s Reply"), pp. 1-3 [Docket No. 16] (citing Resp.'s Ex. 18 (Appellant's Brief in Minnesota Court of Appeals), pp. 23-27; Resp.'s Ex. 24 (Appellant's Brief to Minnesota Supreme Court dated July 22, 2013), (same); Resp.'s Ex. 28 (Appellant's Reply Brief to Minnesota Supreme Court), pp. 10-13); Resp.'s Ex. 30 (Petition for a Writ of Certiorari to the United States Supreme Court), p. 15.  Respondent also argued that "full and fair" litigation does not require a remand to the state district court, particularly where Petitioner had litigated the consent issue in the Minnesota Supreme Court without objection or where the Minnesota Supreme Court affirmed the denial of his motion to suppress on grounds different than those relied upon by the Scott County District Court and Minnesota Court of Appeals.  <u>Id.</u>, pp. 3-4. Further, Respondent submitted that state law did not prevent Petitioner, like others, from raising the consent issue in the Scott County District Court. <u>Id.</u>, p. 5, & n. 2 (citing and attaching four cases raising consent issue).

## II.     DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs a federal court's review of habeas corpus petitions filed by state prisoners.  AEDPA provides that a district court may entertain a habeas petition submitted by a state

prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Section 2254 provides that a habeas corpus petition

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Petitioner is proceeding under 28 U.S.C. § 2254(d)(1) and (2).

However, Fourth Amendment claims are not cognizable in federal habeas proceedings if the state provided the petitioner an opportunity for the full and fair litigation of such claims.  Stone, 428 U.S. at 494; see also Chavez v. Weber, 497 F.3d 796, 801-02 (8th Cir. 2007) (same) (citation omitted).

In order to establish that he was not afforded an opportunity for full and fair litigation of his Fourth Amendment claim, Petitioner has "to show that the State 'provided no corrective procedures at all to address the alleged Fourth Amendment violation' or that the State 'provided a corrective mechanism, but [he] was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.'"  Chavez, 497 F.3d at 802 (quoting Willett, 37 F.3d at 1271-72 (adopting two-part test set forth in Capellan v. Riley, 975 F.2d 67, 71 (2d Cir.1992)); see also Hannam v. Roerich, Civ. No. 09-2724 (JMR/SRN), 2009 WL 3754210, at *2 (D. Minn. Nov. 4, 2009) ("[A] Fourth Amendment claim is Stone-barred, and thus unreviewable by a

federal habeas court, unless either the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system.") (citations omitted).

"Application of the first part of the test is simple enough—either the state has a system available for raising Fourth Amendment claims or it does not (and we are unaware of any state that does not)." Willett, 37 F.3d at 1272.  Further, a "petitioner's 'opportunity' for full and fair litigation should not depend upon whether he has taken advantage of the process available—that is, whether he has 'clearly informed' the state court of the facts supporting his claim and 'has argued' that his constitutional rights have been violated." Id. at 1271 (citations omitted).

As to the second part of this test, a "'mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process.'" Hannam, 2009 WL 3754210, at *2 (quoting Chavez, 497 F.3d at 802) (quoting Capellan , 975 F.2d at 72)).  Indeed, "[t]he determination of whether there has been an 'unconscionable breakdown' in a state's procedures does not require a review of the state courts' fact-finding process, or a review of the state courts' application of Fourth Amendment law." Id. (citing Willett, 37 F.3d at 1272).  To the contrary, "[t]he federal courts on habeas review of such claims are not to consider whether full and fair litigation of the claims in fact occurred in the state courts, but only whether the state provided an opportunity for such litigation." Willett, 37 F.3d at 1273 (emphasis in original); see also Chavez, 497 F.3d at 802 ("Our inquiry focuses on

whether Chavez received an opportunity for full and fair litigation of his claim, not on whether legal or factual error in fact occurred) (citation omitted).

Based on these principles, the Court finds that Petitioner's Fourth Amendment claims are barred by Stone. The state-court system provided Petitioner with several opportunities to litigate his Fourth Amendment consent claim and in fact, he did so. First, Petitioner filed a motion to suppress in the Scott County District Court, in which he argued that the exigent-circumstances exception did not justify the warrantless search of his blood and urine. Resp.'s Ex. 4 (Defendant's Facts and Memorandum in Support of Motion to Suppress). Nothing prevented Petitioner from also arguing that he had not voluntarily consented to the alcohol tests.

Second, Petitioner was granted the opportunity to present his claim that the alcohol tests were not voluntary when the United States Supreme Court reversed and remanded his cases back to the Minnesota Court of Appeals in light of McNeely, and he did exactly that. In his brief to the Minnesota Supreme Court, Petitioner did not argue that the court did not have a factual basis to determine whether he had consented to the testing of his blood or urine, nor did he ask the court to remand the cases back to the trial courts to develop a factual record on the issue of consent. Rather, based on the facts to which he had been stipulated at the trial court level, Petitioner asserted that his consent to the warrantless searches was coerced. Resp.'s Ex. 24 (Appellant's Brief to Minnesota Supreme Court dated July 22, 2013), pp. 1, 5, 10, 11, 23-27. The Minnesota Supreme Court considered and rejected that argument on the merits. Brooks III, 838 N.W.2d at 568-73. Acknowledging that Scott County had not argued, nor did the Scott County District Court determine, if Petitioner had consented to the urine tests, the court

concluded that the record was sufficiently developed for it to consider the issue of consent because the facts upon which it was basing its determination that Petitioner had consented were facts to which the parties stipulated.  Id. at 568 n. 2.

Third, in his petition for a writ of certiorari to the United States Supreme Court, Petitioner laid out the factual underpinnings developed at the trial court level in both the Scott County and Hennepin County cases to support his argument that his consent had been coerced.  See Resp.'s Ex. 30, pp. 7-10.  Again, Petitioner did not argue to the Supreme Court that the Minnesota Supreme Court did not have an evidentiary basis for its determination that Petitioner had voluntarily consented to the alcohol tests.  To the contrary, the entire thrust of his Petition was that based on Supreme Court jurisprudence, the Minnesota Supreme Court was simply wrong in its conclusion.  Id., pp. 11-26.

Based on this record, the Court finds that Petitioner not only had ample opportunities to present his consent claim arising out of the Scott County convictions in the state court proceedings, but he actually litigated the claim on the merits.  While it is true that Petitioner did not address the consent issue in the Scott County District Court and the Minnesota Court of Appeals, the salient point is that he certainly could have done so, and ultimately did just that when he presented his appeal to the Minnesota Supreme Court on stipulated facts following remand from the United States Supreme Court, and again to the United States Supreme Court in his petition for writ of certiorari.

Petitioner contended that he "never had the opportunity to raise the consent issue in Scott County District Court because, at the time, the state of the law was well-settled and held that consent for a blood alcohol concentration test was coerced, but the

rapid dissipation of alcohol through the body created a per se exigency to the warrant requirement."  Pet.'s Resp., p. 3 (citing <u>Netland</u>, 762 N.W.2d at 214; <u>Shriner</u>, 751 N.W.2d at 549; <u>Prideaux</u>, 247 N.W.2d at 388).  Because the law was well settled, any arguments raised by Petitioner regarding consent would have been unnecessary, as district courts are bound to follow higher courts on matters of law, and Petitioner could not have reasonably predicted that the United States Supreme Court would vacate his conviction and remand to the state courts.  <u>Id.</u>, pp. 6, 7, 10.

Petitioner cited three cases in support of his argument.  Pet.'s Resp., pp. 5-11 (citing <u>Bostick</u>, 3 F.3d at 1027; <u>Bailey</u>, 699 F.2d at 425; <u>Boyd</u>, 631 F.2d at 250–51).

In <u>Bostick</u>, the defendant, Bostick, had been charged with possession of controlled substances with intent to deliver.  3 F.3d at 1025.  Bostick filed a motion to suppress drugs found in a suitcase, along with a sworn affidavit and memorandum setting forth Bostick's recollection of the events leading up to his arrest.  <u>Id.</u>  During the suppression hearing, the trial court stated that Bostick would not have to testify in support of the allegations in the affidavit.  <u>Id.</u>  As such, Bostick did not take the stand, but two agents testified on behalf of the state.  <u>Id.</u>  The trial court granted Bostick's motion to suppress.  <u>Id.</u>  The state appealed the suppression order, and the appellate court reversed on the grounds that while Bostick's affidavit was sufficient to make a preliminary showing that he was entitled to an evidentiary hearing, it was not adequate to prove the facts stated in the affidavit.  <u>Id.</u>  Back in the trial court, Bostick moved for a hearing to proffer testimony in support of his motion to suppress, but the court denied his request for an evidentiary hearing based on the fact that the appellate court had sent the case back for trial.  <u>Id.</u> at 1025-26.  The case then proceeded to a bench trial, at

which time the evidence Bostick sought to suppress was admitted and he was convicted.  Id. at 1026.   On motion for a new trial, Bostick moved for a second suppression hearing, but the request was denied.  Id.  Bostick appealed his conviction and the appellate court affirmed the conviction along with the denial of a second suppression hearing, holding that no additional evidence or exceptional circumstances warranted reconsideration of the issue, and that Bostick should have presented his evidence at the first hearing.  Id.

Bostick then filed a petition for a writ of habeas corpus in federal court.  Bostick argued that the use of the evidence found in the suitcase violated his Fourth Amendment rights and that the state did not afford him an opportunity to litigate the issue fully and fairly because he reasonably relied on the trial court's initial ruling that his testimony was not necessary to substantiate the facts stated in his affidavit in support of his motion to suppress.  Id.  When that ruling turned out to be wrong, Bostick was then denied an opportunity to present his testimony to support the affidavit.  Id.  The district court disagreed and held that Bostick's habeas petition was precluded by Stone.  Id. The Seventh Circuit reversed.  In so doing, the court rejected the state's argument that Bostick was given an opportunity before the trial judge in the first instance to litigate his claim and that he chose not to support his allegations with competent evidence.  Id. at 1028.

> According to the state, there was nothing precluding Bostick's counsel from offering testimony to substantiate the motion to suppress. Indeed, after telling [Bostick's counsel] to sit down and that Bostick's testimony would not be necessary, [the trial judge] asked [Bostick's counsel] whether he wanted to put any witnesses on the stand. The state contends that this opportunity is all that Stone requires, and

that it was [Bostick's counsel's] failure to make a record that prevented Bostick's claim from being considered.

But the state's contentions do not address the practical realities of the situation. . . . In the face of the trial court's express ruling that no testimony was necessary, it would be unreasonable to require Bostick's counsel to attempt to present testimony in anticipation that [the trial judge] would be reversed. . . . In these circumstances, a party may rely on a trial court's favorable ruling, and is not required in effect to question the judge's probity by attempting to insist on an "unnecessary" procedure.

Id. at 1028.  The Seventh Circuit concluded that "the unanticipated and unforeseeable application of a rule on appeal prevented the state courts from properly considering the merits of [Bostick's] claim," which amounted to a "failure in the state's procedural mechanism for addressing Fourth Amendment challenges" and denied him "the opportunity for full and fair litigation of his claim."[4]  Id. at 1029.

---

[4]      In reaching its conclusion, the Seventh Circuit applied the following standard for deciding whether the state had afforded the petitioner an opportunity for full and fair litigation:

[A] federal habeas court must determine first whether the state procedural mechanism, in the abstract, presents the opportunity to raise a Fourth Amendment claim. Second, there must be a determination whether the presentation of the claim in question was in fact frustrated by a failure of that mechanism. The presentation of a claim is frustrated by a failure in the state procedural mechanism if there has been no "meaningful inquiry by the state courts" into the Fourth Amendment claim, either because the state courts did not carefully and thoroughly address the factual basis of the petitioner's claim or because the state courts did not apply the proper constitutional case law to the facts as developed."

Bostick, 3 F.3d at 1027 (citations and footnote omitted).  This standard was rejected by the Eighth Circuit in Willett.  There, the court declined to adopt the three-part test set forth in Weber v. Murphy, 15 F.3d 691 (7th Cir. 1994), the same test applied in Bostick, which held that a petitioner has a full and fair opportunity to litigate his Fourth Amendment claims if

> (1) he has "clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of . . . [his] fourth amendment rights and (2) the state court has carefully and thoroughly analyzed the facts and [(3)] applied the proper constitutional case law to the facts."

Willett, 37 F.3d at 1271 (alterations in original) (citing Weber, 15 F.3d at 694).   After rejecting the Weber test as a subversion of Stone, the Willett court explained:

> [T]he Seventh Circuit in Bostick, after stating the [two-part Capellan test], went on to explain that there was a failure of the state-court mechanism if the state court failed parts (2) and (3) of the three-part test in Weber, discussed above. But if the Stone rule permitted this sort of inquiry into state court findings of fact and conclusions of law on a federal petition for writ of habeas corpus, then it seems to us Stone might just as well never have been written, for such an application would result at best in only marginal limitation upon habeas review of Fourth Amendment claims. Moreover, such broad federal habeas review of the merits of a state prisoner's Fourth Amendment claims is inconsistent with Stone's teaching that state courts are as capable of fairly and competently adjudicating Fourth Amendment claims as are federal courts.

37 F.3d at 1272 (citing Stone, 428 U.S. at 494 n. 35).

In any event, the Court notes that the Bostick court made it clear that "[a] petitioner is not denied an opportunity for full and fair litigation of his claim if he fails to raise and to preserve the claim in state court." Id. at 1027 (citing United States ex rel. Maxey v. Morris, 591 F.2d 386, 388–89 (7th Cir.), cert. denied, 442 U.S. 912, 99 S.Ct. 2828, 61 L.Ed.2d 278 (1979)).   In Maxey, the Seventh Circuit rejected the petitioners' argument that Stone should not bar their habeas petition because it would have been futile for them to litigate the basis of their Fourth Amendment challenge in the state courts and thus, "they had no real opportunity to do so."   591 F.2d at 389.   As the appellate court explained:

> [Petitioners'] objection appears to be not that they could not litigate their claim, but that it was almost certain that if they did, they would not receive the answer they wanted. What appellants are seeking here federal court review of state court constitutional holdings is what Stone v. Powell sought to avoid.

Id.

In <u>Bailey</u>, two brothers, Frank and Hank Bailey, were charged with numerous counts of first and second degree burglary.  <u>Bailey</u>, 699 F.2d at 424.  At trial, they moved to suppress the evidence seized from Hank's home, contending that the warrant was not supported by probable cause.  <u>Id.</u>  The motion was denied and the brothers were convicted.  <u>Id.</u>  They then filed a post-trial motion to correct errors, again asserting that the search warrant was improperly issued and that the evidence should have been suppressed.  <u>Id.</u>  In opposition, the state argued, in part, that Frank did not have standing to challenge the warrant.  <u>Id.</u> at 424-25.  The court denied the motion, but made no reference to the standing issue.  <u>Id.</u> at 425.  The Indiana appellate court reversed the convictions on the grounds that the evidence upon which the convictions were based had been illegally seized.  <u>Id.</u> at 425. The state petitioned for rehearing, arguing for the first time in the appellate court that Frank lacked standing to object to the search, which had occurred at Hank's home.  <u>Id.</u>  The court granted the petition for rehearing as to Frank, and reinstated his conviction.  <u>Id.</u>  After the Indiana Supreme Court refused to hear the case, Frank filed for federal habeas relief.  <u>Id.</u>  The district court denied the habeas petition.  On appeal, Frank asserted that "by ignoring the well-established principle that new issues may not be raised on a petition for rehearing, the Indiana appellate court denied [him] his right to a full and fair opportunity to litigate the standing issue."  <u>Id.</u>  The Seventh Circuit agreed and reversed the denial of the habeas petition, holding  that, because the state had not raised the standing issue in the original appeal, Frank was justified in assuming the issue had been waived.  <u>Id.</u>  The appellate court noted that Frank's only opportunity to address the standing issue was in a post-trial motion, which "was neither thoroughly argued nor analyzed by the trial court," and

25

that standing was neither briefed nor orally argued in the initial appeal.  Id.  Accordingly,

Frank never had a "full and fair opportunity" to litigate the standing issue in state court.

Id. at 425-26.

In Boyd, the defendant Boyd was charged in Monmouth County, New Jersey with

rape, assault with intent to rape, assault with an offensive weapon, and unlawful

possession of a weapon.  631 F.2d at 248.  Boyd sought to suppress evidence obtained

during a warrantless search, but the public defender filed the motion fourteen days late

and without a formal application for an extension of time.  Id.  Earlier that year, the

Monmouth County Court had instituted an unwritten policy requiring that extensions of

time be made via formal application to the court.  Id.  Accordingly, Boyd's motion to

suppress evidence was denied.  Id.  Boyd was convicted and appealed.  The Superior

Court, Appellate Division affirmed the dismissal of the motion to suppress, and the

Supreme Court of New Jersey denied his petition for certification.  Id. at 249.  Boyd then

filed a petition for a writ of habeas corpus in federal court.  The petition was denied on

grounds that Stone precluded consideration of the Fourth Amendment claim because

the state had provided Boyd an opportunity to challenge evidence on Fourth

Amendment grounds.  Id. at 249-50.  The Third Circuit reversed, finding that an

unconscionable breakdown in the state-court process had prevented Boyd from

presenting his Fourth Amendment claim because the unwritten local policy was not

firmly entrenched, and Boyd did not "intentionally or inadvertently waive or bypass the

state procedures."  Id. (citation omitted).

The Court finds that these three cases are inapposite to the instant habeas

petition.  Although there may be instances where a petitioner's failure to raise a claim in

state court is justified under Stone, as the Seventh Circuit recognized, the perceived futility of a claim cannot alone constitute an unconscionable breakdown in state-court procedures.   Maxey, 591 F.2d at 391 ("The requirement that issues be properly preserved for review permeates our legal system and is fundamental to its efficient functioning. The fact that a litigant is virtually certain the ruling will be adverse cannot excuse the failure to observe this basic procedural requirement. Appellants are in effect inviting the federal courts to determine when the substantive law applied by state courts is so clear that it would be 'futile' to raise a question before them and then to conclude that the 'futility' excuses the failure to preserve the question as required by state procedural rules. We would decline this invitation in any event in view of Stone v. Powell.").   The test under Stone is whether there was an opportunity for full and fair litigation of a claim, not whether such a claim would have been successful on the merits. See Willett, 37 F.3d at 1269 ("Stone . . . requir[es] only that the petitioner have been afforded in the state courts 'an opportunity for full and fair litigation,' not that this opportunity must produce either factual findings or legal conclusions that would survive ordinary federal habeas review.") (internal citation omitted); cf. Engle v. Isaac, 456 U.S. 107 (1982) ("[T]he futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid."); Maynard v. Lockhart, 981 F.2d 981, 985 (8th Cir. 1992) ("Maynard's belief that it would have been futile for him to assert these allegations in his

post-conviction petition cannot by itself establish cause for omitting the claims.")
(citation omitted).  To accept Petitioner's position would require the Court to speculate
as to whether a claim would have been successful had it been raised in state court.
Such inquiry is not only impracticable, but it is foreclosed by Stone and Willett.  See
Willett, 37 F.3d at 1272 ("A determination of whether there has been a breakdown in the
state's procedure does not require a probing review of the state court record, either of
the factual findings pertaining to the petitioner's search-and-seizure claims or of the
application of Fourth Amendment principles to those facts.").

In any event, even if futility were a proper ground to excuse Petitioner's failure to
raise the consent issue at the trial court level or in conjunction with his first round of
appeals to the Minnesota Court of Appeals and Minnesota Supreme Court, Petitioner
actually stipulated, briefed and argued the issue during his reinstated appeal and
accelerated review in the Minnesota Supreme Court, and again in his second petition
for a writ of certiorari to the United States Supreme Court.  Moreover, unlike in Boyd
and Bailey, there were no external factors which prevented Petitioner from presenting
his Fourth Amendment claim.   Accordingly, Petitioner cannot show that an
unconscionable breakdown in the state-court procedures occurred.

The Court also finds no merit to Petitioner contention that the Minnesota state
court procedures suffered an unconscionable breakdown because the courts failed to
conduct a reasoned inquiry into Petitioner's consent claim.  Pet's Resp., p. 5 (quoting
Valtin, 248 F. Supp. 2d at 317).  In Petitioner's view, courts must thoroughly examine
relevant questions of facts and law by, for example, holding an evidentiary hearing on
the circumstances surrounding a Fourth Amendment claim.  Id.

Petitioner's argument is contrary to <u>Stone</u>. "[D]etermining whether the state court 'carefully and thoroughly analyzed the facts' and then 'applied the proper constitutional law' would require the very review of the state court record that the <u>Stone</u> rule is intended to circumvent." <u>Willett</u>, 37 F.3d at 1271.

But again, more to the point, in this case Petitioner stipulated at the trial court level to the facts that underlie his consent challenge, and again in his appeal to the Minnesota Supreme Court, and again in his second certiorari petition to the United States Supreme Court. Further, while Petitioner disagrees with the decision of the Minnesota Supreme Court, that is not a proper basis for pursuing habeas relief. The Minnesota Supreme Court carefully analyzed those facts to make its determination that he had voluntarily consented to both the urine tests.

In summary, the Court finds that Petitioner not only had a full and fair opportunity to present his Fourth Amendment consent claim in state court, but he actually did so. <u>Willett</u>, 37 F.3d at 1271 ("[H]e has clearly informed the state court of the facts supporting his claim and has argued that his constitutional rights have been violated.") (citations and internal quotation marks omitted). The State provided ample corrective procedures to address the alleged Fourth Amendment violation and there is no evidence that an unconscionable breakdown in the underlying process occurred. Accordingly, under <u>Stone</u>, Petitioner may not relitigate the claim on federal habeas review, and his petition for habeas relief should be denied.

## III. RECOMMENDATION

For the reasons set forth above, and based upon all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED:

1.      Respondent's Motion to Dismiss Petition for Writ of Habeas Corpus [Docket No. 7] be **GRANTED.**

2.      Petitioner Wesley Eugene Brooks' Petition for Writ of Habeas Corpus (Scott County) [Docket No. 1] be **DENIED** and this matter be DISMISSED WITH PREJUDICE.

Dated:      January 6, 2015

                                            *s/ Janie S. Mayeron*
                                            JANIE S. MAYERON
                                            United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 21, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within fourteen days after service thereof. All briefs filed under this Rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.